## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 19th day of September, two thousand twenty-five.

Present:

DEBRA ANN LIVINGSTON,
 *Chief Judge,*
RICHARD J. SULLIVAN,
MICHAEL H. PARK,
WILLIAM J. NARDINI,
STEVEN J. MENASHI,
EUNICE C. LEE,
BETH ROBINSON,
MYRNA PÉREZ,
ALISON J. NATHAN,
SARAH A. L. MERRIAM,
MARIA A. KAHN,
 *Circuit Judges.*

_____

RUMESYA ÖZTÜRK,

 *Petitioner-Appellee,*

 v.                             25-1019

PATRICIA HYDE, IN HER OFFICIAL
CAPACITY AS THE NEW ENGLAND
FIELD DIRECTOR FOR U.S.
IMMIGRATION AND CUSTOMS

ENFORCEMENT, MICHAEL KROL, IN HIS OFFICIAL CAPACITY AS HSI NEW ENGLAND SPECIAL AGENT IN CHARGE, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, TODD LYONS, IN HIS OFFICIAL CAPACITY AS ACTING DIRECTOR, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, KRISTI NOEM, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE UNITED STATES DEPARTMENT OF HOMELAND SECURITY, MARCO A. RUBIO, IN HIS OFFICIAL CAPACITY AS SECRETARY OF STATE, DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES,

*Respondents-Appellants.*

_____

MOHSEN MAHDAWI,

*Petitioner-Appellee,*

v.                                                                     25-1113

DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES, PATRICIA HYDE, IN HER OFFICIAL CAPACITY AS ACTING BOSTON FIELD OFFICE DIRECTOR, IMMIGRATION AND CUSTOMS ENFORCEMENT, ENFORCEMENT AND REMOVAL OPERATIONS, J DOE, IN

2

OFFICIAL CAPACITY AS VERMONT
SUB-OFFICE DIRECTOR OF
IMMIGRATION AND CUSTOMS
ENFORCEMENT, ENFORCEMENT AND
REMOVAL OPERATIONS, TODD LYONS,
IN HIS OFFICIAL CAPACITY AS ACTING
DIRECTOR, U.S. IMMIGRATION AND
CUSTOMS ENFORCEMENT, KRISTI
NOEM, IN HER OFFICIAL CAPACITY AS
SECRETARY OF THE UNITED STATES
DEPARTMENT OF HOMELAND
SECURITY, MARCO A. RUBIO, IN HIS
OFFICIAL CAPACITY AS SECRETARY OF
STATE, PAMELA BONDI, IN HER
OFFICIAL CAPACITY AS U.S.
ATTORNEY GENERAL,

*Respondents-Appellants.*

_____

| | |
|---|---|
| For Respondents-Appellants in *Öztürk* and *Mahdawi*: | DREW C. ENSIGN, Alanna T. Duong, Yaakov M. Roth, Civil Division, United States Department of Justice, Washington, D.C. |
| | Michael P. Drescher, Acting United States Attorney for the District of Vermont, Burlington, VT. |
| For Respondents-Appellants in *Öztürk*: | Sarah S. Wilson, Civil Division, United States Department of Justice, Washington, D.C. |
| For Respondents-Appellants in *Mahdawi*: | Dhruman Y. Sampat, Ernesto H. Molina, Civil Division, United States Department of Justice, Washington, D.C. |

3

| | |
|---|---|
| For Petitioners-Appellees Rumesya Öztürk and Mohsen Mahdawi: | ESHA BHANDARI (arguing on behalf of Rumesya Öztürk), Brett Max Kaufman, Brian Hauss, Noor Zafar, Sidra Mahfooz, American Civil Liberties Union Foundation, New York, NY. |
| | NAZ AHMAD (arguing on behalf of Mohsen Mahdawi), Ramzi Kassem, Mudassar Hayat Toppa, Shezza Abboushi Dallal, CLEAR Project, Main Street Legal Services, Inc., Long Island City, NY. |
| | Lia Ernst, Monica H. Allard, ACLU Foundation of Vermont, Montpelier, VT. |
| For Petitioner-Appellee Rumesya Öztürk: | Jessie J. Rossman, Adriana Lafaille, Rachel E. Davidson, Julian Bava, American Civil Liberties Union Foundation of Massachusetts, Inc., Boston, MA. |
| | Mahsa Khanbabai, North Easton, MA. |
| | Matthew D. Brinckerhoff, Katherine Rosenfeld, Vasudha Talla, Sonya Levitova, Emery Celli Brinckerhoff Abady Ward & Maazel LLP, New York, NY. |
| For Petitioner-Appellee Mohsen Mahdawi: | Nathan Freed Wessler, American Civil Liberties Union Foundation, New York, NY. |
| | Hillary A. Rich, ACLU Foundation of Vermont, Montpelier, VT. |
| | Andrew B. Delaney, Martin Delaney & Ricci Law Group, Barre, VT. |

Luna Droubi, Matthew Melewski, Keegan Stephan, Beldock Levine & Hoffman LLP, New York, NY.

Cyrus D. Mehta, David A. Isaacson, Cyrus D. Mehta & Partners PLLC, New York, NY.

Following the issuance of the motion panel's opinion in *Öztürk v. Hyde* on May 7, 2025, and its opinion in *Mahdawi v. Trump* on May 9, 2025, denying the government's motion to stay in both cases and denying the government's request for a writ of mandamus in both cases, a petition for panel rehearing and rehearing *en banc* was filed in each case. An active judge of the Court requested a poll on whether to rehear the motions *en banc*. A poll having been conducted and there being no majority favoring *en banc* review, the petition for rehearing *en banc* is hereby **DENIED**.

Steven J. Menashi, *Circuit Judge*, joined by Michael H. Park, *Circuit Judge*, concurs by opinion from the denial of rehearing *en banc*.

Alison J. Nathan, *Circuit Judge*, joined by Eunice C. Lee, Beth Robinson, Myrna Pérez, Sarah A. L. Merriam, and Maria A. Kahn, *Circuit Judges*, concurs separately by opinion in the denial of rehearing *en banc*.

Barrington D. Parker and Susan L. Carney, *Circuit Judges*, filed a statement with respect to the denial of rehearing *en banc*.

Raymond J. Lohier, Jr., and Joseph F. Bianco, *Circuit Judges*, took no part in the consideration or decision of the petition.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk

5

MENASHI, *Circuit Judge*, joined by PARK, *Circuit Judge*, concurring in the denial of rehearing *en banc*:

In these cases, a motions panel issued opinions denying motions for stays pending appeal. *See Ozturk v. Hyde*, 136 F.4th 382 (2d Cir. 2025); *Mahdawi v. Trump*, 136 F.4th 443 (2d Cir. 2025). The government has petitioned for rehearing *en banc* of those decisions.[1]

In my view, the motions panel erred by authorizing the use of habeas to collaterally attack ongoing removal proceedings. Congress has provided that "no court shall have jurisdiction, by habeas corpus … or by any other provision of law," to review any questions of law or fact "arising from any action taken or proceeding brought to remove an alien from the United States" except on a petition for review of a final order of removal. 8 U.S.C. § 1252(b)(9). Moreover, "no court shall have jurisdiction to hear any cause or claim" that arises from "the decision or action" to "commence" removal proceedings. *Id*. § 1252(g). While these jurisdictional bars may still allow aliens to challenge the conditions of their confinement during removal proceedings, the statutes do not permit the use of habeas to "challeng[e] the decision to detain them in the first place or to seek removal." *Jennings v. Rodriguez*, 583 U.S. 281, 294 (2018) (plurality opinion). Yet that is precisely how the motions panel allowed habeas to be used in these cases. In doing so, the motions panel created conflicts with other circuits and decided questions of exceptional importance that would normally justify rehearing *en banc*. *See* Fed. R. App. P. 40(b).

---

[1] *See* Petition for Rehearing, *Ozturk v. Hyde*, No. 25-1019 (2d Cir. May 18, 2025), ECF No. 82; Petition for Rehearing, *Mahdawi v. Trump*, No. 25-1113 (2d Cir. May 18, 2025), ECF No. 93.

Under the circumstances, however, the *en banc* court will not rehear the decisions of the motions panel to deny the stays pending appeal. Briefs have already been filed in the merits appeals, and the legal questions will be decided on the merits. The opinion of the motions panel will not constrain what the merits panel may decide either as law of the case or through precedent.

## I

The motions panel erred by treating removal and detention in anticipation of removal as separate processes for purposes of the jurisdictional provisions of the Immigration and Nationality Act ("INA"). The motions panel concluded that challenges to immigration detention are "independent of, or wholly collateral to, the removal process." *Ozturk*, 136 F.4th at 397; *Mahdawi*, 136 F.4th at 450. But that is wrong.

Both petitioners here were detained in anticipation of removal. The record before the motions panel indicated that Mahdawi was detained after the Secretary of State determined that his presence in the United States would have "serious adverse foreign policy consequences," *Mahdawi*, 136 F.4th at 447, and that Ozturk was detained after the State Department revoked her student visa on a similar basis, *see Ozturk*, 136 F.4th at 388-89. "On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). That is the authority the government exercised here. It did not detain the petitioners for any reason independent of its decision to commence removal proceedings. It detained them because of those proceedings. Neither petitioner has alleged a reason for his or her detention that is not also the reason for the government's decision to commence removal proceedings.

2

*See, e.g.*, Habeas Petition at 1, *Mahdawi v. Trump*, No. 25-1113 (2d Cir. May 1, 2025), ECF No. 7 (seeking habeas relief based on the government's alleged "retaliatory and targeted detention *and attempted removal* of Mr. Mahdawi for his constitutionally protected speech") (emphasis added).[2]

Congress has—in three separate provisions of the INA— directed that courts may not entertain a habeas challenge under these circumstances because challenges to removal must be decided on a petition for review of a final order of removal.

## A

First, § 1252(g) provides that "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter." 8 U.S.C. § 1252(g). The Supreme Court has

---

[2] The concurring opinion on behalf of the panel indulges the fiction that Ozturk was "arrested solely due to an op-ed article she had written" and that Mahdawi was "arrested solely in retaliation for his … advocacy work." *Post* at 1-2. In fact, the reason for their *arrests* was the decision to initiate removal proceedings; the Attorney General may detain aliens pending removal proceedings under 8 U.S.C. § 1226(a). The reason for their *removals* is the determination of the Secretary of State that their conduct—including the conduct the concurring opinion identifies—undermined U.S. foreign policy. It is possible to reach the conclusion that the reasons for the *removals* are actually the "sole[]" reasons for the *detentions* only by ignoring the fact that the petitioners have been placed in removal proceedings. While petitioners may make "challenges to detention that are independent of challenges to removal orders" by challenging the conditions of their confinement, the petitioners here instead challenged the grounds for the removal proceedings. H.R. Rep. No. 109-72, at 176 (2005) (Conf. Rep.), *as reprinted in* 2005 U.S.C.C.A.N. 240, 301.

held that § 1252(g) bars the claims of aliens that the government is "selectively enforcing immigration laws against them in violation of their First and Fifth Amendment rights" because such claims represent a "challenge to the Attorney General's decision to 'commence proceedings' against them." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 474, 487 (1999) (quoting 8 U.S.C. § 1252(g)). The decision of the government to commence removal proceedings against an alien includes the detention of the alien pending the removal determination. *See* 8 U.S.C. § 1226(a). In other words, the decision to detain is a "specification of the decision to 'commence proceedings' which … § 1252(g) covers." *Reno*, 525 U.S. at 485 n.9.

Other circuits have recognized this straightforward point. "By its plain terms," § 1252(g) "bars us from questioning [the government's] discretionary decisions to commence removal" of an alien, which include the "decision to take him into custody and to detain him during his removal proceedings." *Alvarez v. ICE*, 818 F.3d 1194, 1203 (11th Cir. 2016).[3] As a result, "claims stemming from the decision to arrest and detain an alien at the commencement of removal proceedings are not within any court's jurisdiction." *Limpin v. United States*, 828 F. App'x 429, 429 (9th Cir. 2020).[4] The

---

[3] *See also Gupta v. McGahey*, 709 F.3d 1062, 1065 (11th Cir. 2013) ("Securing an alien while awaiting a removal determination constitutes an action taken to commence proceedings."); *Suri v. Trump*, No. 25-1560, 2025 WL 1806692, at *11 (4th Cir. July 1, 2025) (Wilkinson, J., dissenting) ("[W]hen the government detains an alien under § 1226(a)—which authorizes detention 'pending a decision on whether the alien is to be removed'—the detention arises from the commencement of proceedings or adjudication of cases.").

[4] *See also Sissoko v. Rocha*, 509 F.3d 947, 949-50 (9th Cir. 2007) ("Sissoko's detention arose from Rocha's decision to commence expedited removal proceedings. As a result, 8 U.S.C. § 1252(g) applies to the Sissokos'

4

jurisdictional bar of § 1252(g) does not distinguish between different grounds for such a claim. The decisions of the motions panel authorizing such claims despite § 1252(g) created a conflict with these circuits.

**B**

Second, § 1252(b)(9) provides that "[j]udicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order." 8 U.S.C. § 1252(b)(9). Congress specified that "no court shall have jurisdiction, by habeas corpus under [28 U.S.C. § 2241] or any other habeas corpus provision … or by any other provision of law (statutory or nonstatutory), to review such an order or such questions of law or fact." *Id.*; *see also id.* § 1252(a)(5) (applying the same jurisdictional bar to "judicial review of an order of removal"). While § 1252(b)(9) may not bar claims challenging the conditions or scope of detention of aliens in removal proceedings, it does bar claims "challenging the decision to detain them in the first place." *Jennings*, 583 U.S. at 294 (plurality opinion).[5] By making such a challenge, the

_____

claim. … [W]e hold that 8 U.S.C. § 1252(g)'s jurisdiction-stripping language covers the Sissokos' false arrest claim. The claim directly challenges Rocha's decision to commence expedited removal proceedings."); *Jimenez-Angeles v. Ashcroft*, 291 F.3d 594, 599 (9th Cir. 2002) ("We construe § 1252(g), which removes our jurisdiction over 'decisions to commence proceedings' to include not only a decision in an individual case *whether* to commence, but also *when* to commence, a proceeding.") (alterations omitted).

[5] *See also Jennings*, 583 U.S. at 317 (Thomas, J., concurring in part and concurring in the judgment) ("Section 1252(b)(9) is a 'general jurisdictional limitation' that applies to 'all claims arising from deportation proceedings' and the 'many decisions or actions that may be part of the deportation

habeas claims require a court to answer *"legal questions"* that arise from "an action taken to remove an alien," so the claims "fall within the scope of § 1252(b)(9)." *Jennings*, 583 U.S. at 295 n.3 (plurality opinion). The habeas claims in these cases do exactly that.

Again, other circuits have reached this conclusion. When an alien "seeks release from detention," if "his claim is based on the alleged invalidity of his order of removal" or his anticipated removal, "he is seeking 'judicial review of an order of removal' which is barred." *Gonzalez-Alarcon v. Macias*, 884 F.3d 1266, 1275 (10th Cir. 2018) (quoting 8 U.S.C. § 1252(a)(5)). Thus, "[w]hen a claim by an alien, however it is framed, challenges the procedure and substance of an agency determination that is 'inextricably linked' to the order of removal, it is prohibited by section 1252(a)(5)." *Martinez v. Napolitano*, 704 F.3d 620, 623 (9th Cir. 2012).

Our court has previously reached the same conclusion. In *Delgado v. Quarantillo*, an alien subject to a reinstated removal order brought a mandamus action to compel the government to adjudicate her Form I-212 application for a waiver of inadmissibility. *See* 643 F.3d 52, 54 (2d Cir. 2011). We explained that "[o]btaining such a waiver is a necessary prerequisite to her ultimate goal of adjustment of status" and that "an adjustment-of-status challenge is inextricably linked to the reinstatement of an alien's removal order" because it amounts to

---

process.' Detaining an alien falls within this definition—indeed, this Court has described detention during removal proceedings as an 'aspect of the deportation process.' … The phrase 'any action taken to remove an alien from the United States' must at least cover congressionally authorized portions of the deportation process that necessarily serve the purpose of ensuring an alien's removal.") (alterations and citation omitted) (quoting *Reno*, 525 U.S. at 482-83; *Demore v. Kim*, 538 U.S. 510, 523 (2003); and 8 U.S.C. § 1252(b)(9)).

6

a challenge to the removal order. *Id*. at 55 (internal quotation marks and alteration omitted). We recognized that the alien was "indirectly challenging her reinstated order of removal, and accordingly, we [held] that section 1252(a)(5)'s jurisdictional bar applies equally to preclude such an indirect challenge." *Id.*

In the *Ozturk* and *Mahdawi* cases, the petitioners sought a declaration that the government's "actions to arrest and detain Petitioner violate the First Amendment and the Due Process Clause of the Fifth Amendment." Habeas Petition at 22, *Ozturk v. Hyde*, No. 25-1019 (2d Cir. Apr. 24, 2025), ECF No. 19; Habeas Petition at 18, *Mahdawi v. Trump*, No. 25-1113 (2d Cir. May 1, 2025), ECF No. 7. But those actions were taken to effectuate the removal of the petitioners and relied on the same rationale. The arguments the petitioners have offered to challenge the detentions necessarily challenge the government's decision to commence removal proceedings. In other words, the petitioners claimed that the detentions are unlawful because the government has no lawful grounds for removing them in the first place.

The proceedings before the district courts illustrate the point. The district court in *Mahdawi* recognized that the Secretary of State has determined that Mahdawi's "presence and activities in the United States would have serious adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest." *Mahdawi v. Trump*, 781 F. Supp. 3d 214, 222 (D. Vt. 2025). That determination was based on information the government collected showing that:

> Mahdawi, though his leadership and involvement in disruptive protests at Columbia University, has engaged in anti-Semitic conduct through leading pro-Palestinian protests and calling for Israel's destruction. Mahdawi

7

has been identified at those protests as having engaged in threatening rhetoric and intimidation of pro-Israeli bystanders. The activities and presence of Mahdawi in the United States undermines U.S. policy to combat anti-Semitism around the world and in the United States, in addition to efforts to protect Jewish students from harassment and violence in the United States. Under E.O. 14188, Additional Measures to Combat Anti-Semitism, it is the policy of the United States to combat antisemitism, using all available and appropriate legal tools to hold to account the perpetrators of unlawful anti-Semitic harassment and violence. Consistent with E.O. 14150, America First Policy Directive to the Secretary of State, the foreign policy of the United States champions core American interests and American citizens and condoning anti-Semitic conduct and disruptive protests in the United States would severely undermine that significant foreign policy objective. Moreover, protests of the type led by Mahdawi potentially undermine the peace process underway in the Middle East by reinforcing anti-Semitic sentiment in the region[] and thereby threatening the U.S. foreign policy goal of peacefully resolving the Gaza conflict.

Memorandum of the Secretary of State to the Secretary of Homeland Security at 1-2, *Mahdawi v. Trump*, No. 25-CV-389 (D. Vt. Apr. 28, 2025), ECF No. 42-1. Based on this reasoning, the government determined that Mahdawi "is a deportable alien" under 8 U.S.C. § 1227(a)(4)(C)(i). *Id.* at 1. The district court reviewed the legality of this explanation from the government about why Mahdawi was removable as well as other public statements in which the

8

government articulated its policy of removing aliens who have engaged in activities that conflict with the U.S. foreign policy.[6]

Based on the government's justification for removing Mahdawi, the district court concluded that Mahdawi had raised "a 'substantial claim' of First Amendment retaliation" because the government took an "adverse action" against him based on "protected speech." *Mahdawi*, 781 F. Supp. 3d at 230-31. "Such an act," it said, "would be a violation of the Constitution." *Id.* at 228. The holding of the district court is not limited to Mahdawi's conditions of confinement but challenges the government's decision to commence removal proceedings. The district court decided that the Constitution prohibits the government from taking an "adverse action" based on its reasons for removing Mahdawi; that decision impermissibly resolved legal questions arising from "the decision to seek removal"—and it called the removal into question. *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 19 (2020) (alteration omitted) (quoting *Jennings*, 583 U.S. at 294 (plurality opinion)).

Similarly, the district court in *Ozturk* observed that the "basis offered by the government to justify Ms. Ozturk's arrest is an assessment by the Department of Homeland Security ('DHS') and ICE that she 'had been involved in associations that "may undermine U.S. foreign policy by creating a hostile environment for Jewish students and indicating support for a designated terrorist organization" including co-authoring an op-ed that found common cause with an

---

[6] *See Mahdawi*, 781 F. Supp. 3d at 231 ("The fact sheet also promises to deport or revoke the student visas of 'all Hamas sympathizers on college campuses, which have been infested with radicalism like never before.' It threatens: 'To all the resident aliens who joined the pro-jihadist protests, we put you on notice: come 2025, we will find you, and we will deport you.'") (citation omitted).

9

organization that was later temporarily banned from campus.'" *Ozturk v. Trump*, No. 25-CV-374, 2025 WL 1420540, at *3 (D. Vt. May 16, 2025) (quoting Memorandum from the National Security Division of the Department of State at 6, *Ozturk v. Trump*, No. 25-CV-374 (D. Vt. Apr. 11, 2025), ECF No. 91-1). But that assessment was not made to justify Ozturk's arrest. It was the justification by which the State Department "approved revocation" of Ozturk's "F-1 visa." Memorandum from the National Security Division of the Department of State, *supra*, at 6. The district court nevertheless relied on this justification—alongside "statements by the Secretary of State describing the purpose of the government's actions"—to conclude that Ozturk had a substantial "First Amendment retaliation claim" based on "a causal connection between protected speech by Ms. Ozturk and adverse action by the government." *Ozturk*, 2025 WL 1420540, at *6-7.

The district courts in these habeas proceedings have scrutinized the government's reasons for commencing removal proceedings and declared those reasons to be unlawful. It makes sense in these cases that the arguments against detention cannot be separated from the arguments against removal; the government had no reason aside from its decision to commence removal proceedings for detaining the petitioners. But that also means that the district courts decided "questions of law and fact, including interpretation and application of constitutional and statutory provisions," that have arisen from the government's actions "to remove an alien from the United States." 8 U.S.C. § 1252(b)(9). Congress has barred the use of habeas to mount these challenges to the removal proceedings, even "indirectly." *Delgado*, 643 F.3d at 55. The jurisdictional bar applies to the "questions of law" the district courts have decided; it does not

10

depend on a formal distinction between the discrete actions the government has taken to remove the aliens. 8 U.S.C. § 1252(b)(9).[7]

## C

Third, § 1252(a)(2)(B) provides that "no court shall have jurisdiction to review" any judgment regarding the granting of discretionary immigration relief or "any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security." 8 U.S.C. § 1252(a)(2)(B). Even if there were any remaining ambiguity as to whether an alien could challenge the decision to detain him during removal proceedings—on the dubious theory that the detention was somehow neither part of the decision to commence removal proceedings nor an action taken to remove the alien— Congress added this third jurisdictional bar to clarify that courts may not entertain a challenge to a discretionary decision under the INA. The motions panel concluded that § 1252(a)(2)(B) was unlikely to bar jurisdiction here because the statute that authorizes the Attorney General to decide where a detainee is held, 8 U.S.C. § 1231(g)(1), "uses the obligatory 'shall' rather than a permissive 'may.'" *Ozturk*, 136 F.4th at 395.

---

[7] The other concurrence insists that "§ 1252(b)(9) poses no barrier" because the "petitioners do not challenge orders of removal." *Post* at 9. But § 1252(b)(9) is not limited to direct challenges to orders of removal. It bars review of "all questions of law and fact … arising from any action taken or proceeding brought to remove an alien." 8 U.S.C. § 1252(b)(9). Section 1252(b)(9) is an "unmistakable 'zipper' clause" that "channels judicial review of *all*" of the "decisions and actions of the INS." *Reno*, 525 U.S. at 483.

That conclusion was incorrect because the statute confers discretion on the Attorney General to decide which places of detention are "appropriate." 8 U.S.C. § 1231(g)(1). And the Attorney General "may expend" appropriated funds "to acquire, build, remodel, repair, and operate facilities." *Id.*

More important, the statute that authorizes the detention pending removal proceedings in the first place clearly confers discretion. "On a warrant issued by the Attorney General, an alien *may* be arrested and detained pending a decision on whether the alien is to be removed from the United States." *Id*. § 1226(a) (emphasis added). Additionally, except when detention is mandatory based on the alien's criminal history, "pending such decision, the Attorney General … *may* continue to detain the arrested alien." *Id.* (emphasis added). Indeed, the motions panel acknowledged that the detention decision "was not directed by § 1226(a)" and "not mandated by the mere fact that [the petitioner's] case was under adjudication." *Ozturk*, 136 F.4th at 398 (emphasis omitted); *see also Mahdawi*, 136 F.4th at 451. That means it was a discretionary decision under the INA that is insulated from judicial review. But the motions panel authorized review of the decision nonetheless.

The other concurrence relies on our decision in *Nethagani v. Mukasey* for the proposition that "when a statute authorizes the Attorney General to make a determination, but lacks additional language specifically rendering that determination to be within his discretion … the decision is not one that is 'specified to be in the discretion of the Attorney General' for purposes of § 1252(a)(2)(B)(ii)." 532 F.3d 150, 154-55 (2d Cir. 2008) (alteration omitted). Our decision in *Nethagani* implicates another circuit split, *see, e.g.*, *Estrada-Martinez v. Lynch*, 809 F.3d 886, 892 n.2 (7th Cir. 2015) (disagreeing with *Nethagani*), over a different line of cases that the

Supreme Court has addressed, *see Wilkinson v. Garland*, 601 U.S. 209, 217 (2024) (explaining that the application of a "statutory standard" to "a given set of facts is reviewable as a question of law under § 1252(a)(2)(D)").[8]  In any event, *Nethagani* does not apply here.

In *Nethagani*, we considered "the two provisions [that] authorize the Attorney General (respectively) to 'determine' or 'decide' that the alien was convicted of a particularly serious crime." 532 F.3d at 154 (alterations omitted) (quoting 8 U.S.C. § 1158(b)(2)(A); *id.* § 1231(b)(3)(B)). That determination or decision involves the application of statutory standards "for crimes that are particularly serious *per se*" and of standards set forth in BIA precedent. *Id.* at 155. We agreed with the Third Circuit that "[t]he terms 'decide' or 'determine' are not, standing alone, sufficient to 'specify' discretion" because those terms describe "the application of facts to principles" that an adjudicator would undertake. *Alaka v. Att'y Gen.*, 456 F.3d 88, 96 (3d Cir. 2006) (alterations omitted); *see Nethagani*, 532 F.3d at 155 (agreeing with *Alaka*).

These cases look nothing like that one. Here, § 1226(a) expressly provides that an alien "*may* be arrested and detained" and that "the Attorney General … *may* continue to detain the arrested alien." 8 U.S.C. § 1226(a) (emphasis added); *see Alaka*, 456 F.3d at 98 (recognizing that discretion has been "'specified' sufficiently to bar our review when" the statute states that the official "'may' (rather than 'shall')" undertake the action). The statute not only authorizes a

---

[8] *See also Dor v. Garland*, 46 F.4th 38, 43-44 (1st Cir. 2022) (explaining that "what standard governs 'particularly serious crime' determinations for non-aggravated felons in deportation proceedings" is a question of law under § 1252(a)(2)(D) because it involves "the application of a legal standard to undisputed or established facts").

decision that is "so subjective as to provide no meaningful legal standard," *Alaka*, 456 F.3d at 99, but the statute provides no legal standard to limit the Attorney General's discretion at all. "As a result, the government's decision to detain is one of the 'discretionary determinations' that the INA provides 'some measure of protection' from judicial intervention." *Suri*, 2025 WL 1806692, at *11 (Wilkinson, J., dissenting) (quoting *Reno*, 525 U.S. at 485).

## D

The motions panel's evasion of the three separate limitations on our jurisdiction has resulted in the possibility of contradictory rulings from the federal courts of appeals in the same case. In the Second Circuit, habeas proceedings have proceeded to challenge the petitioners' detentions, and the Second Circuit has essentially decided that it was unlawful to detain the petitioners in order to remove them.[9] But removal proceedings continue in the Fifth Circuit, and the Fifth Circuit may decide that the removals are lawful. So even though the legal arguments are the same, and Congress has authorized detention whenever the removal proceedings are permissible,[10] the result in these cases may be that it is unconstitutional for the

---

[9] *See Ozturk*, 136 F.4th at 399 ("She asserts that the government arrested and detained her to prevent speech with which it disagrees. Such an act would be a violation of the Constitution."); *Mahdawi*, 136 F.4th at 452 ("He asserts that the government arrested him to punish speech with which it disagrees. But doing so would violate the Constitution.").

[10] *See* 8 U.S.C. § 1226(a); *Jennings*, 583 U.S. at 317 (Thomas, J., concurring in part and concurring in the judgment) ("As the Court explains today, Congress either mandates or permits the detention of aliens for the entire duration of their removal proceedings.").

government to detain aliens pending removal for a reason that allows the government to remove them.

Congress channeled judicial review of removal proceedings into a single proceeding to avoid such an incoherent result. By enacting § 1252(b)(9), "Congress plainly intended to put an end to the scattershot and piecemeal nature of the review process that previously had held sway in regard to removal proceedings." *Aguilar v. ICE*, 510 F.3d 1, 9 (1st Cir. 2007) (citing H.R. Rep. No. 109-72, at 174). It designed the statutes "to consolidate and channel review of *all* legal and factual questions that arise from the removal of an alien into the administrative process, with judicial review of those decisions vested exclusively in the courts of appeals." *Id*.

It is reasonable to conclude, as we have said, that the jurisdictional bars do not prevent the adjudication of a claim that is "unrelated to any removal action or proceeding," *Delgado*, 643 F.3d at 55 n.3 (quoting *Ruiz v. Mukasey*, 552 F.3d 269, 274 n.3 (2d Cir. 2009)), or "independent of challenges to removal orders," H.R. Rep. No. 109-72, at 176. But when the petitioners are "challenging the decision to detain them in the first place" because the removal proceedings are allegedly unlawful, that is a challenge to the removal proceedings that Congress has barred. *Jennings*, 583 U.S. at 294 (plurality opinion); *see also id.* at 314 (Thomas, J., concurring in part and concurring in the judgment) ("§ 1252(b)(9) removes jurisdiction over [aliens'] challenge to their detention.").

### E

The other concurrence dismisses as "frivolous" the government's argument that it has suffered an irreparable injury because it has been prevented from exercising its statutory authority. *Post* at 10. The motions panel similarly insisted that "the government

15

has not demonstrated in what way it is being enjoined by a court from effectuating statutes enacted by representatives of its people." *Mahdawi*, 136 F.4th at 454 (internal quotation marks and alteration omitted).

That argument is bizarre. Congress has authorized the executive branch to decide whether and where to detain an alien pending removal proceedings. *See* 8 U.S.C. §§ 1226(a), 1231(g)(1). Judicial orders entered in defiance of jurisdictional limitations—based on the dubious conclusion that detentions pending ongoing removal proceedings are unlawful—have now prevented the government from exercising that statutory authority. The Supreme Court has "long held that, 'any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.'" *Labrador v. Poe*, 144 S. Ct. 921, 923 (2024) (Gorsuch, J., concurring in the grant of stay) (alteration omitted) (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)); *accord New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.").

The motions panel decided that judicial interference with the detention does not matter because "nothing prevents the government from continuing … the removal proceedings it has commenced." *Ozturk*, 136 F.4th at 402; *Mahdawi*, 136 F.4th at 455. But "detention is necessarily a part of this deportation procedure." *Demore*, 538 U.S. at 524 (alteration omitted) (quoting *Carlson v. Landon*, 342 U.S. 524, 538 (1952)). Congress has authorized the executive branch to detain an alien pending immigration proceedings to provide "time to determine an alien's status without running the risk of the alien's either absconding or engaging in criminal activity before a final

16

decision can be made." *Jennings*, 583 U.S. at 286 (majority opinion). The detention "serves the purpose" of preventing deportable aliens "from fleeing prior to or during their removal proceedings, thus increasing the chance that, if ordered removed, the aliens will be successfully removed." *Demore*, 538 U.S. at 528. The Supreme Court "has recognized detention during deportation proceedings as a constitutionally valid *aspect of the deportation process*." *Id.* at 523 (emphasis added).

In these cases, the government exercised its statutory authority to implement removal proceedings that involved detention of the aliens while the proceedings were ongoing. "[T]he inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State." *Abbott v. Perez*, 585 U.S. 579, 603 n.17 (2018).

## II

The foregoing considerations justify *en banc* rehearing in these cases because the motions panel decided questions of exceptional importance in a way that conflicts with the decisions of other circuits. *See* Fed. R. App. P. 40(b). At this stage of the litigation, however, the only appellate proceedings have involved the decisions of a motions panel to deny motions for stays pending appeal based on the government's jurisdictional arguments. Those decisions will not constrain a subsequent merits panel—in this case or in others.

## A

"Nearly every Circuit, including this one, has held that a merits panel may revisit a motions panel's decision on jurisdiction." *Hassoun v. Searls* (*Hassoun II*), 976 F.3d 121, 134 (2d Cir. 2020) (internal quotation marks and alterations omitted); *see also Paskar v. U.S. Dep't of Transp.*, 714 F.3d 90, 95 (2d Cir. 2013) ("A merits panel may revisit a decision made by a motions panel."). "Because law of the case

17

doesn't bind an appellate court even as to final orders, it follows that the doctrine is even less binding in the context of interlocutory orders." *Rezzonico v. H & R Block, Inc.*, 182 F.3d 144, 149 (2d Cir. 1999). We have offered "[s]everal reasons" for that conclusion:

> First, … the law of the case doctrine is discretionary, not mandatory. The doctrine expresses, in shorthand fashion, a practice of courts generally not to reconsider that which has already been decided. But it does not purport to be a legally binding limitation on the court's authority to reconsider such matters. Second, a motions panel's decision is based on an abbreviated record and made without the benefit of full briefing by the parties, which may result in a less than thorough exploration of the issues. Third, reexamination of a question regarding our jurisdiction is especially important whenever there is reason to believe that it may be lacking.

*Id.* (citation omitted). That is how the circuit courts have generally understood the effect of a decision of a motions panel on the law of the case:

> Rulings—predictions—as to the likely outcome on the merits made for preliminary injunction purposes do not ordinarily establish the law of the case, whether the ruling is made by a trial court or by an appellate court. The same approach applies to similar preliminary relief rulings, as attachment or an appellate injunction pending appeal. A fully considered appellate ruling on an issue of law made on a preliminary injunction appeal, however, does become the law of the case for further proceedings in the trial court on remand and in any subsequent appeal.

18B Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 4478.5 (3d ed. 2025) (footnotes omitted). An

"initial ruling on appealability … often is made by a motions panel, frequently without the benefit of the arguments that may be made after full briefing and with the understanding that reconsideration by the merits panel is appropriate." *Id.*

We and other circuits have relied on these considerations to conclude that the decision of a motions panel is "without precedential authority" on a subsequent panel. *Kaplan v. Rand*, 192 F.3d 60, 68 (2d Cir. 1999).[11] The opinion of a motions panel resolving a motion for a stay pending appeal predicts the likelihood of success before a merits panel that will itself resolve the merits.[12] Even when an opinion of the merits panel has failed to materialize—because the case became moot before the merits were addressed—we have declined to vacate an earlier opinion of a motions panel addressing a stay motion because there were "no legal consequences of the court's opinion for the parties, in terms of preclusion or even precedent." *Hassoun II*, 976 F.3d at 134. Other circuits have similarly concluded that "the necessarily tentative and preliminary nature of a stay-panel opinion precludes the opinion from having an effect outside that case."

---

[11] *See also Kell v. Benzon*, 925 F.3d 448, 462 n.12 (10th Cir. 2019) ("Because *Kozeny* was issued by a two-judge motions panel, we would ordinarily discount the opinion's precedential value.") (discussing *In re Kozeny*, 236 F.3d 615, 619-20 (10th Cir. 2000)); *Wallace v. FedEx Corp.*, 764 F.3d 571, 583 (6th Cir. 2014) ("[T]he decisions of motions panels are generally interlocutory in nature (and, thus, not strictly binding upon subsequent panels).").

[12] *See SEC v. Citigroup Glob. Markets Inc.*, 673 F.3d 158, 161 (2d Cir. 2012) ("The merits panel is, of course, free to resolve all issues without preclusive effect from this ruling. … [O]ur ruling, to the extent it addresses the merits, finds only that the movant has shown a likelihood of success and does not address the ultimate question to be resolved by the merits panel—whether the district court's order should in fact be overturned.").

19

*Democratic Exec. Comm. of Fla. v. Nat'l Republican Senatorial Comm.*, 950 F.3d 790, 795 (11th Cir. 2020). Those circuits have explained that "[a]n order granting a stay pursuant to F.R.A.P. 8 is not a final adjudication of the merits of the appeal" and, "[t]o the extent that it deals with the merits of the appeal, it is only a prediction as to the likelihood of how they will be resolved." *FTC v. Food Town Stores, Inc.*, 547 F.2d 247, 249 (4th Cir. 1977).

**B**

The other concurrence suggests that the decision of a motions panel might create "dispositive precedent" such that opinions from our shadow docket of emergency motions will preclude any future merits panels from reconsidering the same issues with full briefing on a full record. *Post* at 16. That is incorrect.

The Supreme Court has explained that "interim orders are not conclusive as to the merits" but only "inform how a court should exercise its equitable discretion in like cases." *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025). A "stay order is not a ruling on the merits, but instead simply stays [a lower-court] injunction *pending a ruling on the merits*." *Merrill v. Milligan*, 142 S. Ct. 879, 879 (2022) (Kavanaugh, J., concurring in grant of applications for stays). The point is to allow the court "to decide the merits in an orderly fashion—after full briefing, oral argument, and our usual extensive internal deliberations—and ensure that we do *not* have to decide the merits on the emergency docket." *Id*. A "decision on the interim legal status" of some action might "often constitute a form of precedent (*de jure* or *de facto*) that provides guidance … during the years-long interim period until a final decision on the merits." *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2570 (2025) (Kavanaugh, J., concurring). But the decision to grant or to

deny interim relief during that period does not resolve the legal questions.

The Justices have sometimes, "in denying emergency relief, stressed that 'equitable considerations' counseled against preliminary relief," *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 721 n.10 (2007) (alteration omitted) (quoting *Bustop, Inc. v. Bd. of Ed.*, 439 U.S. 1380, 1383 (1978) (Rehnquist, J., in chambers)), and the Court has emphasized that "[t]he propriety of preliminary relief and resolution of the merits are of course 'significantly different' issues," *id.* (quoting *Univ. of Texas v. Camenisch*, 451 U.S. 390, 393 (1981)). We understand the scope of a stay decision in light of the traditional equitable principles that apply "whenever a court order may allow or disallow anticipated action before the legality of that action has been conclusively determined." *Nken v. Holder*, 556 U.S. 418, 434 (2009); *see also Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318 (1999) ("[T]he equity jurisdiction of the federal courts is the jurisdiction in equity exercised by the High Court of Chancery in England at the time of the adoption of the Constitution and the enactment of the original Judiciary Act.").[13] Those principles are "heavily influenced by the division of jurisdiction" in which the Court of Chancery would provide "preliminary relief in cases where the

---

[13] The Supreme Court has explained that "[a]n appellate court's power to hold an order in abeyance while it assesses the legality of the order has been … preserved in the grant of authority to federal courts" under the All Writs Act, *Nken*, 556 U.S. at 426 (citing 28 U.S.C. § 1651(a)), which "invests a court with a power essentially equitable," *Clinton v. Goldsmith*, 526 U.S. 529, 537 (1999). The Act authorizes a federal court to "issue all writs necessary or appropriate in aid of their respective jurisdictions" but only insofar as the issuance is "agreeable to the usages and principles of law." 28 U.S.C. § 1651(a).

final decision on the merits was reserved to the courts of law."[14] Under those circumstances, when the Court of Chancery decided whether a party had a likelihood of success on the merits, it was not deciding a legal question but instead predicting what the law courts would do. The analysis reflected "the awkwardness of protecting common law rights in a court unqualified to declare whether the rights existed. The theme was comity, not premature adjudication."[15] "The rationale for *predicting* the strength of the plaintiff's case rather than *adjudicating* it on the spot" extended "from a reluctance to pass on common law rights to an unwillingness to reach the merits without a full hearing"; as a result, "even in cases where Chancery itself ultimately would decide the merits, the court began to *predict* rather than *assess* the merits" when deciding whether to grant preliminary relief.[16] The judges explained "that avoiding premature decision was an end in itself, perhaps even the court's 'great object.'"[17]

In the context of a stay pending appeal, we continue to describe the determination of a likelihood of success as a prediction about

---

[14] John Leubsdorf, *The Standard for Preliminary Injunctions*, 91 Harv. L. Rev. 525, 527 (1978).

[15] *Id.* at 532; *see Great W. Ry. Co. v. Birmingham & Oxford Junction Ry. Co.*, 41 Eng. Rep. 1074, 1076 (Ch. 1848) ("[T]he Court will in many cases interfere and preserve property in *statu quo* during the pendency of a suit, in which the rights to it are to be decided, and *that* without expressing, and often without having the means of forming, any opinion as to such rights."); *see also Hunter v. Thomas*, 173 F.2d 810, 812 (10th Cir. 1949) ("Habeas corpus is a civil proceeding. It is a legal, not an equitable, remedy.") (footnote omitted).

[16] Leubsdorf, *supra* note 14, at 533 (emphasis added).

[17] *Id.*

what the merits panel will do rather than an independent legal determination:

> In deciding whether the court should stay the grant or denial of a preliminary injunction pending appeal, the motions panel is predicting the likelihood of success of the appeal. That is, the motions panel is predicting rather than deciding what our merits panel will decide. In resolving the merits of a preliminary injunction appeal, our merits panel is deciding the likelihood of success of the actual litigation.

*E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 660 (9th Cir. 2021).[18] The distinctive treatment of a stay makes sense because "a stay operates upon the judicial proceeding itself. It does so either by halting or postponing some portion of the proceeding, or by temporarily divesting an order of enforceability." *Nken*, 556 U.S. at 428. In other words, a stay "suspend[s] judicial alteration of the status quo." *Ohio Citizens for Responsible Energy, Inc. v. Nuclear Regul. Comm'n*, 479 U.S. 1312, 1312 (1986) (Scalia, J., in chambers).[19]

---

[18] Similarly, "[t]o obtain a stay pending the filing and disposition of a petition for a writ of certiorari, an applicant must show" both "a *reasonable probability* that four Justices will consider the issue sufficiently meritorious to grant certiorari" and "a fair *prospect* that a majority of the Court will vote to reverse the judgment below." *Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010) (emphasis added). Those are also predictive judgments.

[19] We might treat injunctions differently because "[a]n injunction and a stay have typically been understood to serve different purposes." *Nken*, 556 U.S. at 428. An injunction "is a means by which a court tells someone what to do or not to do" and thereby "directs the conduct of a party, and does so with the backing of its full coercive powers." *Id.* The applicable case law accordingly provides that injunctive relief "may only be awarded upon a clear showing that the plaintiff is *entitled* to such relief." *Winter v. NRDC*, 555 U.S. 7, 22 (2008) (emphasis added). The approach accords with the

As a result, "a stay order actually says nothing about the parties' legal rights." [20] The purpose of the stay decision is "to preserve the appellate court's role to decide the appeal (regardless of which way the court rules)" and to "provid[e] meaningful judicial review to parties (again, regardless of which way the court rules)."[21] That purpose often requires the motions panel "to risk the improper deprivation of rights in the meantime"—that is, to *discount* what might be the better view of the merits in light of the paramount remedial considerations.[22]

---

concern that, "if courts dispense injunctions without regard to the merits, plaintiffs who are in the wrong will be just as likely to secure relief as those who have rights." Leubsdorf, *supra* note 14, at 547. But "Professor Leubsdorf did not apply his theory" requiring direct consideration of the merits "to stays pending appeal." Jill Wieber Lens, *Stays of Injunctive Relief Pending Appeal: Why the Merits Should Not Matter*, 43 Fla. St. U. L. Rev. 1319, 1358 n.165 (2016).

[20] Lens, *supra* note 19, at 1340.

[21] *Id.*; *see Hadden v. Dooley*, 74 F. 429, 431 (2d Cir. 1896) ("[W]hen the questions which naturally arise upon the transactions make them a proper subject for deliberate examination, if a stay of proceedings will not result in too great injury to the defendants, it is proper to preserve the existing state of things until the rights of the parties can be fairly and fully investigated and determined by evidence and proofs which have the merit of accuracy.") (internal quotation marks omitted).

[22] Lens, *supra* note 19, at 1340; *see NetChoice, LLC v. Fitch*, No. 25-A-97, 2025 WL 2350189, at *1 (U.S. Aug. 14, 2025) (Kavanaugh, J., concurring in the denial of the application to vacate stay) (concurring in the denial of an "application for interim relief" because even though the applicant had "demonstrated that it is likely to succeed on the merits," it had not "sufficiently demonstrated that the balance of harms and equities favors it at this time").

So when a motions panel decides to grant or to deny a stay pending appeal, it decides whether to preserve the status quo ante based on a prediction of what the merits panel will decide. It is making a predictive judgment rather than a law-declaring one.

Denying those predictive judgments binding effect not only respects the nature of the decisions but also prevents the shadow docket from overtaking our normal appellate procedures. Some jurists have worried that "forecasting the merits risks prejudging them," *Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 200 (3d Cir. 2024), or that a preliminary merits ruling "can create a lock-in effect" that may "predetermine the case's outcome … on the underlying merits question," *Labrador*, 144 S. Ct. at 934 (Kavanaugh, J., concurring in the grant of stay). Treating the stay decisions as having conclusively resolved the legal questions would not merely create the *risk* of prejudgment; it would institutionalize prejudgment by binding future panels to the prediction made in the course of evaluating a motion for a stay. That is the wrong approach:

> Lock-in would be less concerning if there was little chance of error in the initial decision by the motions panel. But the chance of error is significant simply due to the circumstances. Those circumstances include a lack of familiarity with the case, less than full appellate briefing, and possibly no hearing, all within a "compressed timeframe not conducive to deliberate decision-making."[23]

In fact, "[i]t is not uncommon to think and decide differently when one knows more." *CASA*, 145 S. Ct. at 2572 (Kavanaugh, J., concurring); *see also Ritter v. Migliori*, 142 S. Ct. 1824, 1824 (Alito, J.,

---

[23] Lens, *supra* note 19, at 1345 (footnote omitted) (quoting Kevin J. Lynch, *The Lock-In Effect of Preliminary Injunctions*, 66 Fla. L. Rev. 779, 800 (2014)).

dissenting from the denial of the application for stay) ("[A]s is almost always the case when we decide whether to grant emergency relief, I do not rule out the possibility that further briefing and argument might convince me that my current view is unfounded."). The other concurrence agrees that legal questions are best decided with "the benefit of adversarial briefing and argument," and it objects to the "discussion of such complicated issues with little briefing and no argument." *Post* at 20-21. We resolve legal questions in the light of our normal appellate procedures rather than in the shadows of the emergency motions docket.

## C

The other concurrence simultaneously suggests that (1) it is "not worthy of *en banc* review" to reconsider the decision of a motions panel on a stay pending appeal, and (2) the decision of the motions panel might bind every future merits panel to which the same legal issues are presented. *Post* at 3. Those propositions cannot both be true. If the other concurrence were correct that the stay opinions in these cases "created dispositive precedent," *id.* at 16, that would plainly make the cases worthy of *en banc* review. If, however, "this [c]ourt has never reviewed *en banc* a motions panel decision on a stay pending appeal," *id.* at 3, that is a strong clue that we have not previously regarded such decisions as binding.[24]

---

[24] *Cf. N.C. Utilities Comm'n v. FCC*, 552 F.2d 1036, 1045 (4th Cir. 1977) (explaining that "the rule of interpanel accord serves … to allocate decisionmaking power between coequal panels subject to reversal by the Court of Appeals en banc" but when "en banc review … is prevented … strict application of the rule of interpanel accord seems unwarranted"); *Thomas v. Bryant*, 938 F.3d 134, 189 (5th Cir. 2019) (Willet, J., dissenting) ("[I]f the full court cannot take it en banc, then perhaps the other members of this court—who never had the opportunity to reject or bless

26

We have not. Despite all the recent high-profile discussion of the precedential effect of decisions issuing interim emergency relief, the other concurrence rests its case to the contrary only on tendentious readings of scattered language in a couple of older cases.

First, the other concurrence suggests that we decided that all shadow docket decisions were binding in a two-sentence holding in 2003. In *Khan v. Ashcroft*, 352 F.3d 521 (2d Cir. 2003), our court considered whether a prior decision called *Domond* remained valid following the decision of the Supreme Court in *St. Cyr*. We explained that it did. We said that "[w]e see nothing in *St. Cyr II* that detracts from the result or reasoning of *Domond*," and "the same considerations and principle that led us to reach a different decision in *Domond* than we had reached in *St. Cyr I* lead us to conclude that *Domond* remains good law in the wake of the Supreme Court's decision in *St. Cyr II*." *Id.* at 523-24.[25] The *Khan* panel then noted that a motions panel had previously granted a motion to vacate a stay of removal of an alien and, in doing so, decided "at least for purposes of considering the pending motion to lift the stay, that *Domond* remains

what the panel did here—should not be bound by it in a future case."), *on reh'g en banc sub nom. Thomas v. Reeves*, 961 F.3d 800 (5th Cir. 2020).

[25] Given that extensive discussion, "[t]he opinion's discussion elsewhere" about a motions panel's treatment of *Domond* was "thus 'unnecessary to the disposition of the case before it.'" *United States v. Johnson*, 143 F.4th 184, 186 (2d Cir. 2025) (Lohier, J., concurring in the denial of rehearing en banc) (quoting *Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 508 (2d Cir. 1996)). I agree that "[w]here a decision rests on two or more grounds, none can be relegated to the category of obiter dictum." *Id.* at 190 (Menashi, J., concurring in the denial of rehearing en banc) (quoting *Woods v. Interstate Realty Co.*, 337 U.S. 535, 537 (1949)). But several members of our court have rejected that conclusion. *See id.* at 195 n.1 (Merriam, J., dissenting from the denial of rehearing en banc).

binding authority in this Circuit." 352 F.3d at 524 (quoting *Mohammed v. Reno*, 309 F.3d 95, 103 (2d Cir. 2002)). The stay of removal in *Mohammed* was odd in that the district court had also decided that the alien was not entitled to habeas relief. And the motions panel was uncertain that the appropriate way to resolve the propriety of the stay was by motion rather than through a normal appeal.[26]

When the question of the validity of *Domond* arose again in *Khan*, the alien argued "that the words 'at least for purposes of considering the pending motion to lift the stay' indicate that the *Mohammed* panel 'did not intend for other courts to be bound by its decision.'" 352 F.3d at 524. Our court responded that "[w]e reject the contention that the *Mohammed* panel's view of *Domond* was somehow intended to be less than precedential." *Id*. Neither the court nor the parties addressed whether the decision of a stay panel binds a subsequent panel. The litigation focused on what the *Mohammed* panel intended by its qualifying phrase "at least for purposes of considering the pending motion to lift the stay." On the assumption that the import of that phrase is what mattered, the *Khan* court decided that the phrase did not change the fact that "[t]he question of *Domond*'s continued validity was essential to an evaluation of Mohammed's entitlement to a stay." *Id.* That sounds reasonable to me, but the unquestioned assumption is what matters here.

Second, the other concurrence notes that we said in *Hassoun II* that "[v]acatur pursuant to *Munsingwear* is an exception to the regular

---

[26] *See Mohammed*, 309 F.3d at 98 n.2 ("Neither party has considered whether the appropriate procedure for challenging an order granting a stay pending appeal is a motion to lift the stay or an appeal from the order. In the absence of attention to the issue, we will assume that the Government's motion is a suitable device.").

procedure for establishing and revising precedents." 976 F.3d at 135. It suggests that the use of the word "precedents" means that we decided stay panel decisions are binding. But when we vacate a decision pursuant to *Munsingwear*, we are normally vacating the decision of a district court that has become moot pending appeal. The decision of a district court is a "precedent" in that it is a judicial decision, but no decision of a district court is ever binding as a precedential matter.[27] In fact, for that proposition *Hassoun II* cited the decision of the Supreme Court in *U.S. Bancorp Mortgage Company v. Bonner Mall Partnership*, 513 U.S. 18, 26 (1994), which in turn quoted Justice Stevens:

> Judicial precedents are presumptively correct and valuable to the legal community as a whole. They are not merely the property of private litigants and should stand unless a court concludes that the public interest would be served by a vacatur.

*Izumi Seimitsu Kogyo Kabushiki Kaisha v. U.S. Philips Corp.*, 510 U.S. 27, 40 (1993) (Stevens, J., dissenting). Sure enough, Justice Stevens was describing what should happen when the "parties to a case pending on appeal ask the appellate court to vacate the judgment *entered by the trial court*." *Id.* at 34 (emphasis added). No one thinks judgments entered by trial courts are binding on other courts. In this context, "precedents" simply means judicial decisions.

Third, the other concurrence thinks it is some kind of gotcha that I myself have cited the opinion of a stay panel in a subsequent opinion. *See Chen v. Garland*, 43 F.4th 244, 250 (2d Cir. 2022) ("As

---

[27] *See Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case.") (quoting 18 Moore's Federal Practice § 134.02[1] [d] (3d ed. 2011)).

always, 'because we have an obligation to assure ourselves of jurisdiction under Article III, we begin there.'") (alteration omitted) (quoting *Hassoun v. Searls* (*Hassoun I*), 968 F.3d 190, 195 (2d Cir. 2020)). But I have also cited summary orders, out-of-circuit decisions, district court decisions, and law review articles. That does not mean that I regard all those authorities as binding precedents. The quotation of a stay decision for this truism about jurisdiction does not mean that the court was bound by it.[28]  It means that the panel concluded that what the stay opinion said was correct.

Fourth, the other concurrence argues that when *Hassoun II* said that the opinion of a stay panel had "no legal consequences … for the parties, in terms of preclusion or even precedent," 976 F.3d at 134, it must have intended "precedent" to be limited only to party-specific consequences such as preclusion. That is not what it meant. But that is an especially weird argument for the other concurrence to make because it simultaneously argues that the very same word in the next three sentences of the same paragraph must refer to "precedent" as binding for future cases. *See post* at 17-19. That is a lot of weight to put on a single word that apparently means radically different things from sentence to sentence.

The focus of a *Munsingwear* analysis is on the effect for the parties, but that can also include a precedential effect. *See Hassoun II*, 976 F.3d at 133 (noting that, "as a repeat player before the courts," the government "has an institutional interest in vacating adverse rulings of potential precedential value") (quoting *Arevalo v. Ashcroft*, 386 F.3d 19, 20-21 (1st Cir. 2004)). In *Hassoun II*, we explained that "a motions panel's jurisdictional ruling is 'persuasive, but not binding,'" *id.* at 134

---

[28] In this instance, however, *Hassoun I* was merely quoting the decision of the Supreme Court in *Trump v. Hawaii*, 585 U.S. 667, 697 (2018).

(quoting *E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1265 (9th Cir. 2020)), and that the "stay-panel opinion cannot spawn binding legal consequences regarding the merits of the case," *id*. (quoting *Democratic Exec. Comm.*, 950 F.3d at 795).

## D

Even if *Hassoun II* were incorrect about the binding effect of the decision of a motions panel, that would not end the matter. We further explained that if the decision of a motions panel "*will* be binding within th[e] circuit with respect to future requests for similar preliminary relief" or have other "legal consequences" for the government or another party, vacatur would be appropriate. *Id.* at 135 n.9 (emphasis added); *accord Democratic Exec. Comm.*, 950 F.3d at 795 n.2 ("[I]n a rare case where a party could identify any ruling within a stay-panel opinion that *would* have precedential effect beyond the preliminary decision on the stay, then vacatur may be warranted if the case were to become moot."). Under the case law, therefore, either the opinion of a motions panel will not bind future panels as law of the circuit or a party affected by the precedential effect of such an opinion would be entitled to vacatur should the case become moot before the merits are decided. *See United States v. Munsingwear, Inc.*, 340 U.S. 36, 39 (1950); *Azar v. Garza*, 584 U.S. 726, 730-31 (2018) (vacating an order of the court of appeals denying a motion for a stay pending appeal).

These considerations affect whether the *en banc* court will rehear the stay decisions. In these cases, the government sought the stays on a brief timeline and only on the basis of its jurisdictional arguments.[29] The case may look different to a merits panel "with[]

---

[29] *See* Oral Argument Audio Recording, *Mahdawi v. Trump*, No. 25-1113, at 7:07 (the government explaining that its arguments are "based on the

31

the benefit of the arguments that may be made after full briefing." 18B Wright, Miller & Cooper, *supra*, § 4478.5. Because merits briefs have been filed, the merits appeals will be heard in tandem on an expedited timeline, and the stay decisions will not bind the panel that will conclusively decide the issues, it is not unreasonable for the *en banc* court to await a decision on the merits.

*       *       *

Our protocols for conducting a rehearing *en banc* appear to formally but not practically allow for the reconsideration of a stay decision before the merits appeal is heard. But that obstacle is a problem only if the stay decision will control how the issues are decided on the merits.[30] The opinions of the motions panel denying the stays wrongly decided questions of exceptional importance about the scope of our jurisdiction. But those opinions will not prevent the court from arriving at a correct understanding of the applicable jurisdictional limits.

---

jurisdictional bars rather than on the underlying merits" because the merits were not at issue "in these proceedings right now before you"); *id.* at 6:44 (the government explaining that "[w]e have not taken a position" on the constitutional issues).

[30] *See supra* note 24.

NATHAN, *Circuit Judge*, joined by LEE, ROBINSON, PÉREZ, MERRIAM, and KAHN, *Circuit Judges*, concurring in the denial of rehearing *en banc*:

These cases concern the allegedly retaliatory detentions of two students—Rümeysa Öztürk and Mohsen Mahdawi—as part of a wave of arrests and immigration status revocations of lawfully admitted students in the early months of 2025.

At the time of her arrest, Rümeysa Öztürk was a graduate student at Tufts University who had been living lawfully in Massachusetts on a student visa. *Öztürk v. Hyde*, 136 F.4th 382, 388 (2d Cir. 2025). In March 2025, masked and heavily armed plainclothes officers arrested and detained her without warning and drove her away from her home in an unmarked vehicle, through New Hampshire, to Vermont. *Id.* at 389. A day later, she was locked in a correctional facility over fifteen hundred miles away in Louisiana. *Id.* Öztürk brought a habeas petition seeking release, alleging that she had been arrested solely due to an op-ed article she had written a year earlier in support of Palestinian rights in her school newspaper—a violation of her First Amendment rights. *Id.* at 387–89.

When he was detained, Mohsen Mahdawi was an undergraduate student at Columbia University and a lawful permanent resident. *Mahdawi v. Trump*, 136 F.4th 443, 446 (2d Cir. 2025). After living in the United States for over a decade, he appeared for a naturalization interview in April 2025, in Vermont, his state of residence. *Id.* Mahdawi passed his citizenship test—but he did not become a citizen. *Id.* Instead, at the interview's conclusion, armed and masked officers arrested Mahdawi and attempted to transport

him to Louisiana. *Id.* at 446–47. Due to a missed flight, he was placed in a detention center in Vermont. *Id.* at 446. He brought a habeas petition there to challenge his detention, alleging that he had been arrested solely in retaliation for his peaceful antiwar advocacy work—a violation of his First Amendment rights. *Id.*

In both cases, the district court concluded that it had jurisdiction to hear the habeas petitions and then issued the orders at the heart of these appeals. In *Öztürk*, Judge William K. Sessions III of the District of Vermont ordered that Öztürk be physically transferred from Louisiana to Vermont for a bail hearing. *Öztürk v. Trump*, 779 F. Supp. 3d 462, 497–98 (D. Vt. 2025). In *Mahdawi*, Judge Geoffrey W. Crawford of the District of Vermont ordered Mahdawi released on bail pending further proceedings. *Mahdawi v. Trump*, 781 F. Supp. 3d 214, 235 (D. Vt. 2025). The government appealed in both cases and filed emergency stay motions. It argued that the district courts lacked jurisdiction to order Öztürk transferred from Louisiana to Vermont and to release Mahdawi on bail. A motions panel rejected the government's arguments and denied its stay motions, holding that the government was unlikely to succeed in its argument that Congress had deprived the federal courts of jurisdiction to consider the students' habeas petitions, that it had failed to show irreparable harm, and that the balance of the equities favored the students.[1]

The government now petitions for the stay motions to be reheard *en banc*. As we explain below, we concur in the denial of

---

[1] The district court subsequently released Öztürk on bail. *Öztürk v. Trump*, No. 2:25-CV-374, 2025 WL 1355667, at *1 (D. Vt. May 9, 2025). The government neither sought a stay nor appealed the release order.

2

rehearing *en banc*. Procedurally, the posture of these cases heavily disfavors *en banc* review. Substantively, posture notwithstanding, the stay-motion panel opinions are correct. We also write to express our view that the rest of the issues Judge Menashi's concurrence comments on are better left to a merits panel.

**I**

*En banc* review is not particularly common in our circuit. That is often said to be a testament to our traditionally collegial temperament. Jon O. Newman, *Foreword: In Banc Practice in the Second Circuit, 1989–93*, 60 Brook. L. Rev. 491, 503 (1994). It is also a manifestation of the fact that we must primarily carry out our work in three-judge panels, as has been the case since the Judiciary Act of 1891 (also called the Evarts Act), ch. 517, § 2, 26 Stat. 826 (establishing "in each circuit a circuit court of appeals, which shall consist of three judges, of whom two shall constitute a quorum"). Although any member of our Court might have something they deem worthy of saying about a matter on which they are not on the panel, doing so while bypassing the process and ignoring the high standard for rehearing *en banc* is profoundly disruptive to our work. Once one non-panel member weighs in, others may feel compelled to respond. Pretty soon, a matter that no member of our Court deems worthy of *en banc* review has demanded the same amount of the full Court's attention and resources as a real *en banc* proceeding.

The decisions on these stay motions are not worthy of *en banc* review. As far as we are aware, this Court has never reviewed *en banc* a motions panel decision on a stay pending appeal. At the government's request, the underlying appeals will be heard by a

3

merits panel on an expedited basis, with briefing already concluded and oral argument weeks away. The government's decision to seek expedited consideration of the merits of its interlocutory appeals while simultaneously seeking *en banc* review of the stay opinions (without any request for expedition) is—at a minimum—odd. This posture is reason enough to deny rehearing *en banc*. Indeed, the government's petition for rehearing *en banc* in this posture borders on frivolous, as is cogently demonstrated by the fact that no member of the Court dissents from its denial.

## II

Since the entire Court agrees that rehearing *en banc* is inappropriate, the matter should have ended there. However, Judge Menashi has made the unusual decision to weigh in now on how the merits-panel-to-be should resolve the jurisdictional questions posed by this case, offering several arguments as to why he thinks the stay opinions are incorrectly reasoned. Because of this disruption and because he is wrong in several ways, a response is required.

Most importantly, Judge Menashi is wrong on the merits of the jurisdictional questions implicated in these cases. In a sentence, the district courts have habeas jurisdiction because petitioners challenge the legality of their detention, not a removal order. The Fourth Circuit has reached the same conclusion. *See Suri v. Trump*, No. 25-1560, 2025 WL 1806692, at *7–9 (4th Cir. July 1, 2025). And we are unaware of any court, when considering a challenge to allegedly retaliatory detention pending removal, to have disagreed with us.[2] As the stay-

---

[2] That is why Judge Menashi's cited cases, particularly concerning 8 U.S.C. § 1252(g), do not form a circuit split with the stay opinions.

4

motion panel opinions demonstrate, each of the government's jurisdiction-stripping arguments ignores relevant Supreme Court and Second Circuit authority and misses the mark, especially because we must "take account . . . of the presumption favoring interpretations of statutes [to] allow judicial review . . . absent clear statement." *Kucana v. Holder*, 558 U.S. 233, 237 (2010) (quotation marks omitted). That command from the Supreme Court, which helps avoid Suspension Clause issues that may stem from overly broad readings of the INA's jurisdiction-stripping provisions, *see Luna v. Holder*, 637 F.3d 85, 93 (2d Cir. 2011), is nowhere discussed in the government's petition for rehearing or Judge Menashi's concurrence. But under existing law, the government needed to show that the courts below lacked jurisdiction over each and every challenge in the students' petitions, and it failed. *See Öztürk*, 136 F.4th at 397 n.6; *Mahdawi*, 136 F.4th at 450 n.3.

We start with 8 U.S.C. § 1252(g). That section prohibits the use of any habeas provision to challenge "three discrete [government] actions[.]" *Reno v. Am.-Arab Anti-Discrimination Comm. (AADC)*, 525 U.S. 471, 482 (1999). The one purportedly at issue here is the government's decision to "commence proceedings" against a noncitizen. 8 U.S.C. § 1252(g). However, Supreme Court precedent makes clear that this bar is only "narrow[ly]" applied to the *discrete* action barred. *AADC*, 525 U.S. at 482. As the First Circuit has said, § 1252(g) "does not preclude jurisdiction over . . . challenges to the legality of [a noncitizen's] detention." *Kong v. United States*, 62 F.4th 608, 609 (1st Cir. 2023). The reason is simple—detention is but one of "many . . . decisions or actions that may be part of the deportation

5

process," but it is outside the "three discrete actions" § 1252(g) cordons off. *AADC*, 525 U.S. at 482. It is therefore irrelevant that "§ 1252(g) does not distinguish between different grounds for such a [detention] claim," *ante* at 5, because it does not speak to detention *at all*.

Under Judge Menashi's and the government's theory, Congress used three specific words—"commence," "adjudicate," and "execute"—to accomplish something extraordinarily general: eviscerate habeas corpus for noncitizens whenever the government detains them and also seeks to remove them. Supreme Court precedent and the text of § 1252(g) do not allow this, and it is also clear that it is not what Congress intended. H.R. Rep. No. 109-72, at 175 (2005) (Conf. Rep.), *as reprinted in* 2005 U.S.C.C.A.N. 240, 300 (explaining that jurisdiction-stripping provisions "would not preclude habeas review over challenges to detention that are independent of challenges to removal orders"). Congress was concerned with curbing the "frequent[]" use of "habeas corpus petitions to seek review of removal decisions," but did not "withdraw[] habeas relief from those seeking release from unlawful detention." *Kong*, 62 F.4th at 615. And if there is any doubt, we read statutes with the *presumption* of judicial review, not of jurisdiction stripping. *Kucana*, 558 U.S. at 237. The government's elephant simply does not fit in this mousehole. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

It is equally erroneous to argue that the district courts lacked jurisdiction over these students' petitions because of 8 U.S.C. § 1252(a)(2)(B)(ii). That section bars jurisdiction where Congress has

expressly "set out the Attorney General's discretionary authority in the statute." *Kucana*, 558 U.S. at 247. But when arguing that this section deprived the district courts of jurisdiction by virtue of 8 U.S.C. §§ 1226(a) and 1231(g), the government ignores our precedent holding that § 1252(a)(2)(B)(ii) is inapplicable in the absence of "additional language specifically rendering [a] determination to be within [the Attorney General's] discretion (*e.g.*, 'in the discretion of the Attorney General,' 'to the satisfaction of the Attorney General,' etc.)." *Nethagani v. Mukasey*, 532 F.3d 150, 154–55 (2d Cir. 2008). You will find no mention of that principle or of any contrary binding authority on this point in the petition for rehearing. Perhaps that is because the statutory provisions in issue, 8 U.S.C. §§ 1226(a) and 1231(g), are bereft of the necessary specific language and thus do not prevent the district courts from entertaining the habeas petitions here. And though Judge Menashi takes up the task on the government's behalf, *ante* at 12–14, his attempt at distinguishing *Nethagani*, as well as accusing it of creating a circuit split, falls flat.

First and most importantly, *Nethagani* is our law, and it squarely controls our interpretation of the INA's jurisdictional provisions in this context. Judge Menashi's attempt at distinguishing cannot explain (and thus he does not attempt to explain) at all how his preferred reading of § 1231(g) satisfies the "additional language" test. And though Judge Menashi points to § 1226(a)'s use of "may," that term still falls far short of the specific language referring to the Attorney General's discretion that is required by *Nethagani*.

No more troubling is Judge Menashi's drive-by reference to a circuit split. He cites no cases holding that § 1252(a)(2)(B)(ii) outright

7

strips federal courts of habeas jurisdiction to order the transfer or bond hearing of an immigrant whose place of detention was arranged pursuant to § 1231(g) or authorized pursuant to § 1226(a). Whatever tension exists between *Nethagani* and other circuits' decisions more generally is simply not at issue in these cases. At base, if Judge Menashi were arguing for this issue to be heard *en banc*, these would be relevant, yet flimsy, arguments. But since he is not, they simply do nothing to undermine the correctness of the stay panel's opinions with respect to § 1252(a)(2)(B)(ii).

With respect to 8 U.S.C. § 1252(b)(9), the government fares little better. The umbrella provision of § 1252(b) begins: "With respect to review of an order of removal under subsection (a)(1), the following requirements apply: . . . ." 8 U.S.C. § 1252(b). As this text makes clear, § 1252(b) sets out requirements only with respect to review of an order of removal. Since there are no orders of removal for these petitioners, § 1252(b)(9) does not apply. But even if there were, § 1252(b)(9) bars district court review only of claims "arising from . . . action[s] taken or proceeding[s] brought to remove an alien[.]" 8 U.S.C. § 1252(b)(9). The Supreme Court has held that this section "does not present a jurisdictional bar where those bringing suit are not asking for review of an order of removal, the decision . . . to seek removal, or the process by which . . . removability will be determined." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 19 (2020) (quotation marks omitted). Glaringly ignoring the statutory text and the Supreme Court's explanation in *Regents*, Judge Menashi and the government instead rely on dicta in the opinion of three Justices in *Jennings v. Rodriguez*, 583 U.S. 281

8

(2018).[3] But that portion of *Jennings* merely "note[d]" that the jurisdictional question before the Court might have been more difficult if petitioners were challenging "an order of removal; . . . the decision to detain them in the first place[;] . . . [or] the process by which their removability [would] be determined." *Jennings*, 583 U.S. at 294. Judge Menashi and the government overread this language to suggest that *Jennings* supports the inverse proposition—that § 1252(b)(9) bars jurisdiction over habeas challenges to "the decision to detain." Reliance on this dicta is especially unwarranted when *Regents*, which was decided after *Jennings*, does not include the "decision to detain" language in its quote of *Jennings*. *See* 591 U.S. at 19. *Regents* then proceeds to favorably cite a portion of Justice Breyer's dissent in *Jennings* that holds jurisdiction to be "unaffected" when petitioners challenge "their detention without bail" and "not an order of removal." *Jennings*, 583 U.S. at 355 (Breyer, J., dissenting); *see also Regents*, 591 U.S. at 19.

In short, petitioners do not challenge orders of removal—no such orders even yet *exist*—and so § 1252(b)(9) poses no barrier. Nonetheless, the government insists that the petitions impermissibly intrude on the students' removal proceedings because their constitutional challenges to their detention could substantively overlap with a potential challenge to a final removal order. But substantive overlap alone does not transform two independent claims

---

[3] *Cf. United States v. Johnson*, 143 F.4th 184, 189 (2d Cir. 2025) (Menashi, J., concurring in the denial of rehearing *en banc*) (describing dicta as "a comment on how the court would decide some other, different case" (quotation marks omitted)).

9

into one. Instead, our analysis must turn "on the substance of the relief that a plaintiff is seeking." *Delgado v. Quarantillo*, 643 F.3d 52, 55 (2d Cir. 2011). The students here seek release from their unconstitutional detention, which has been at the remedial heart of the Great Writ throughout our constitutional history. *Preiser v. Rodriguez*, 411 U.S. 475, 498 (1973) (describing "immediate release or a speedier release from . . . confinement" as "the heart of habeas corpus"); Paul D. Halliday, Habeas Corpus: From England to Empire 246 (2d ed. 2012) ("[T]he Writ of *Habeas Corpus* ordained by the Common Law of the Land, as a remedy for such as were unjustly imprisoned, to procure their Liberty; and it is a mistaken notion that this Writ is of a modern date." (quoting Giles Jacob, A New Law-Dictionary 348 (1729))).

In any event, rehearing *en banc* is even less warranted because the panel decided the issues in the posture of motions for stays pending appeal. The government does not so much as *mention* irreparable injury—one of the two "most critical" factors in the stay analysis. *Nken v. Holder*, 556 U.S. 418, 434 (2009). And for good reason. Before the motions panel, the government contended only that the district courts' exercise of jurisdiction prevented it from "effectuating statutes" and thus caused it irreparable injury. This argument is frivolous. Neither Öztürk's nor Mahdawi's constitutional challenge to their detention disrupts—and nothing prevents the government from continuing with—the removal proceedings it has commenced. The Third Circuit recently concluded the same in a comparable context. *See* Order at 2, *Khalil v. Trump*, No. 25-2357 (3d Cir. July 30, 2025) (Hardiman, Bibas, Freeman, JJ.) (per

10

curiam) ("Appellants' motion to stay pending appeal the district court's . . . order that Appellee shall be released from immigration custody is denied. Appellants have not demonstrated irreparable harm." (capitalization altered)).

Judge Menashi contends the opposite, citing a few single-Justice statements as well as a footnote in *Abbott v. Perez* for the proposition that "the inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State." 585 U.S. 579, 602 n.17 (2018). But that quote is wrenched from its context, in which the Supreme Court quite unsurprisingly concluded that a state's inability to conduct an election under its laws constituted irreparable harm. *Id.* at 602–03. And the Supreme Court contrasted that situation with one in which a state's election law is invalidated "long before the next scheduled election," which would obviate the need for a stay because the pendency of the litigation—like here—would not interfere with the state's ultimate enforcement of the law. *Id.* at 602.

Judge Menashi is also wrong to imply that detention is an essential aspect of conducting removal proceedings, because the government has already conceded that petitioners' detention in this case is not mandatory. *See Öztürk*, 136 F.4th at 398; *Mahdawi*, 136 F.4th at 451. More importantly, the government did not argue in seeking a stay that the transfer or release of these petitioners would prevent the government from ultimately removing them.

The final factor, the balance of the equities, goes similarly undiscussed by the government and Judge Menashi. Before the motions panels, the government made the feeble argument that potential logistical difficulties and concerns about judicial

11

micromanagement outweighed Öztürk's interest in attending her habeas corpus proceedings in person and Mahdawi's interest in his freedom. We had little difficulty concluding that the balance of the equities tipped in the students' favor then, and we have little difficulty reaching the same unchallenged position now.

In the stay context, it was the *government's* burden to show that it was likely to succeed on the merits; that it would suffer irreparable injury; and that the equities favored a stay. As explained above, the government's arguments, which Judge Menashi's opinion echoes, show none of these.

In short, rehearing a motion for a stay pending appeal *en banc* is particularly inappropriate where the motions panel got it right and the movant fails even to mention other critical factors relevant to its entitlement to a stay.

### III

Judge Menashi's unusual concurrence does not merely wade into this case by expressing a view on the merits. It also dives headfirst into two issues that were unbriefed by any party and unaddressed by either stay opinion, and which are certainly better left to future merits panels: whether a published opinion on a stay motion becomes law of the case and whether such an opinion carries precedential weight. His concurrence attempts to paint a clear picture in which such opinions have no bearing at all on any future panels. Whatever one thinks about law of the case and precedential weight, the waters are far murkier than Judge Menashi would have one believe.

It is thus helpful to begin by setting the terminological stage.

Relevant to this discussion are the distinctions among the concepts of "law of the case," "preclusion," and "precedent."

Under our law of the case doctrine, "when a court decides upon a rule of law, that decision should generally continue to govern the same issues in subsequent stages in the same case." *Rezzonico v. H & R Block, Inc.*, 182 F.3d 144, 148 (2d Cir. 1999) (quotation marks omitted and alteration adopted). That is a discretionary doctrine "of sound, albeit not inexorable, practice," permitting adjustment of prior rulings for "'cogent' or 'compelling' reasons." *Doe v. N.Y.C. Dep't of Soc. Servs.*, 709 F.2d 782, 789 (2d Cir. 1983).

Preclusion doctrine, by contrast, prevents the relitigation of certain claims (called "claim preclusion") and issues (called "issue preclusion") by the same parties in new litigation following a final judgment on the merits. *See Rezzonico*, 182 F.3d at 148. This doctrine, too, is the subject of a host of qualifications and exceptions. *See, e.g.*, *Taylor v. Sturgell*, 553 U.S. 880, 893–95 (2008) (noting "the rule against nonparty preclusion" as well as "six established categories" of exceptions).

And finally, the concept of precedent measures the binding effect of one case's legal holdings in other cases involving different parties. Precedent can be *vertical* (as in how the Supreme Court's decisions bind us, or how our published decisions bind the in-circuit district courts) or *horizontal* (by virtue of our rule prohibiting subsequent panels from overturning prior panel decisions absent either a change in governing law or *en banc* review).

With that, let's start with areas of agreement. First, the stay opinions currently constitute vertical precedent and are binding on

13

the district courts in this Circuit.[4]  Judge Menashi does not suggest otherwise.  Second, the merits panel that will hear these cases is not bound by the stay panel opinions.  We do not suggest otherwise.

In our view, that is where the easy answers end.  But Judge Menashi presses forward, suggesting that because the stay opinions' holdings may be revised pursuant to our law of the case doctrine (again, we agree), those opinions "will not constrain a subsequent merits panel." *Ante* at 17.  Here is where the murkiness begins.  After all, "a merits panel will not ordinarily revisit a ruling by a motions panel absent cogent or compelling reasons." *N.Y. Pet Welfare Ass'n v. City of New York*, 850 F.3d 79, 83 n.3 (2d Cir. 2017) (deferring when the motions panel had "the complete record before it and full briefing on the issue"); *see also United States v. Apple*, 787 F.3d 131, 137 (2d Cir. 2015) (applying law of the case from a ruling on a stay motion); *Shomo v. City of New York*, 579 F.3d 176, 186 (2d Cir. 2009) (applying law of the case from a motion panel's order dismissing the appeal); *Ollman v. Special Bd. of Adjustment No. 1063*, 527 F.3d 239, 251 (2d Cir. 2008) (similar).  Complicating things further, these doctrines *may* work differently for preliminary jurisdictional holdings.  *See, e.g., Lora v. O'Heaney*, 602 F.3d 106, 109 (2d Cir. 2010) (revisiting an "implied" jurisdictional holding reached by a motion panel "based on an

---

[4] Likewise, when the Supreme Court issues a preliminary legal holding in an interim order, lower courts are bound by that holding as a matter of vertical precedent.  *See Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2664 (2025) (Gorsuch, J., concurring in part and dissenting in part) ("[E]ven probabilistic holdings[,] such as [a] top-line conclusion that the Government is likely to succeed in showing the District Court lacked jurisdiction[,] . . . must inform how a lower court proceeds in like cases." (cleaned up)).

14

abbreviated record . . . without the benefit of full briefing" (quotation marks omitted)).  Or they may not.  *See N.Y. Pet Welfare*, 850 F.3d at 83 n.3 (holding no cogent or compelling reason required revisiting motion panel's finding of jurisdiction).  Ultimately, whether the stay opinions' jurisdictional holdings constitute law of the case is for the future merits panel to decide, hopefully with the benefit of adversarial briefing and argument.

But that is not the only difficult question for which Judge Menashi volunteers an oversimplified answer.  He also argues that the stay opinions are neither law of the case *nor precedential* for other cases.[5]  He makes that argument about precedent mostly by extrapolating from the law of the case context, despite the fact that those doctrines are meaningfully distinct and interact in some

---

[5] Judge Menashi is incorrect to suggest that the Supreme Court's recent practice answers these difficult questions.  To that end, he strikingly modifies the Supreme Court's discussion of its own precedents in *Trump v. Boyle*, injecting the word "only" into the sentence:  "Although our interim orders are not conclusive as to the merits, [here, Judge Menashi breaks up the quote to replace "they" with "but only"] inform how a court should exercise its equitable discretion in like cases." 145 S. Ct. 2653, 2654 (2025); *ante* at 20.  Sure enough, add some words, and the meaning will change.  And that's ignoring that *Boyle* resulted in the application of precedent created in a prior interim order, rather than the rejection of it.  *See* 145 S. Ct. at 2654 (applying the rule from *Trump v. Wilcox*, 145 S. Ct. 1415 (2025)).  If anything, the result in *Boyle* demonstrates the precedential value of interim opinions, such as the Supreme Court's recent opinion concerning the propriety of nationwide injunctions, which was likewise decided on a briefed-and-argued stay motion.  *See Trump v. CASA, Inc.*, 606 U.S. 831, 841 (2025) ("The Government is likely to succeed on the merits of its argument regarding the scope of relief.").  But it is difficult to understand how, under Judge Menashi's view, *CASA*'s legal holdings would be precedent for the Supreme Court in a subsequent case raising the same issues.

15

counterintuitive ways.  And Judge Menashi does so by mustering bits and pieces of law from other circuits but dismissing our own, including one from the year 2020, as "a couple of older cases."  *Ante* at 27.  Although we think the issue difficult and best left for a future panel to resolve, we note that two binding Second Circuit precedents cut against Judge Menashi's assertion.

In *Khan v. Ashcroft*, 352 F.3d 521 (2d Cir. 2003), a merits panel of this Court faced the question whether a published opinion by a stay-motion panel in an unrelated case created dispositive precedent.  We held that it did.  *Id.* at 524–25.  In particular, the question was whether the Court was bound by a stay-motion panel's holding that a different case, *Domond v. INS*, 244 F.3d 81 (2d Cir. 2001), was still good law.  The stay-motion panel held that it was.  *See Khan*, 352 F.3d at 524.  And because the "question of *Domond*'s continued validity was essential to an evaluation of [a party's] entitlement to a stay," this Court "reject[ed] the contention that" the stay-motion panel's "view . . . was somehow intended to be less than precedential."  *Id.*  Indeed, even in the face of standard cabining language in stay opinions ("at least for purposes of considering the pending motion to lift the stay . . ."), *Khan* found that the stay-motion panel's holding was "equally applicable in the instant case" and cited other cases in which that motions panel's opinion was "relied on by this Court in addressing the merits of petitions for habeas corpus."  *Id.* at 524–25 (citing as an example *Rankine v. Reno*, 319 F.3d 93, 100–01 (2d Cir. 2003)).  Judge Menashi's attempt to distinguish *Khan* away—suggesting that the Court spent several paragraphs musing about the nature of precedent without

16

relying on it—strains credulity.[6]

The other "older case[]" Judge Menashi attempts to distinguish away is his own, *Hassoun v. Searls* (*Hassoun II*), 976 F.3d 121 (2d Cir. 2020). But *Hassoun II*, in denying a motion to vacate a published stay opinion pursuant to *United States v. Munsingwear, Inc.*, 340 U.S. 36 (1950), is right in line with *Khan*. In the first instance, a panel of this Court granted the government's motion for a stay of Adham Amin Hassoun's release from immigration detention. *Hassoun v. Searls* (*Hassoun I*), 968 F.3d 190, 193 (2d Cir. 2020). Thereafter, Hassoun was removed from the United States, which mooted his claim for release, and he sought vacatur of the stay opinion. *Hassoun II*, 976 F.3d at 125. We declined to vacate *Hassoun I*, explaining about the stay-motion panel's opinion: "Judicial precedents are presumptively correct and valuable to the legal community as a whole. They are not merely the property of private litigants and should stand unless a court concludes that the public interest would be served by a vacatur." *Id.* at 134–35 (quoting *U.S. Bancorp Mortg. Co. v. Bonner Mall P'Ship*, 513 U.S. 18, 26 (1994)).[7] We noted that "[v]acatur pursuant to

---

[6] Judge Menashi tucks into a footnote his belief that *Khan*'s discussion of precedent is mere dicta because the *Khan* Court also independently arrived at the same conclusion as the *Mohammed* panel. *Ante* at 27 n.25. But even if that is true, "where a decision rests on two or more grounds, none can be relegated to the category of obiter dictum." *Woods v. Interstate Realty Co.*, 337 U.S. 535, 537 (1949); *see also Pyett v. Pa. Bldg. Co.*, 498 F.3d 88, 93 (2d Cir. 2007) ("An alternative conclusion in an earlier case that is directly relevant to a later case is not *dicta*; it is an entirely appropriate basis for a holding in the later case."), *rev'd on other grounds sub nom.*, *14 Penn Plaza LLC v. Pyett*, 556 U.S. 247 (2009).

[7] Faced with the inconvenience of *Bancorp*, Judge Menashi now locates the origin of the "presumptively correct and valuable" phrase in Justice Stevens's dissenting

17

*Munsingwear* is an exception to the regular procedure for establishing and revising *precedents*." *Id.* at 135 (emphasis added). But we held *Munsingwear* did not apply, because we saw "no realistic probability" that the stay-motion panel's decision would "spawn legal consequences" for the parties. *Id.* at 134. We explained that, in such circumstances, "a decision poses little risk of prejudice to the parties, [and] the heavy weight of *precedent* and regular procedure greatly exceeds the light, if existent, danger of unfair *preclusive effect*." *Id.* at 135 (emphasis added and quotation marks omitted). In other words, the stay-motion panel's opinion was precedential but not preclusive, and therefore vacatur was inappropriate. *Hassoun II* decided that the precedent of *Hassoun I* would stand.

Judge Menashi, who authored both *Hassoun I* and *II*, now takes a precedent-for-me-but-not-for-thee approach. He does so by ignoring the actual discussion of precedent in *Hassoun II* as well as the outcome, which was a decision to leave the *Hassoun I* motion panel opinion standing as precedent rather than vacate it. He instead focuses on three words in *Hassoun II* that he takes out of context: "Because there are no legal consequences of the court's opinion for the parties, in terms of preclusion *or even precedent*, vacatur is inappropriate." 976 F.3d at 134 (emphasis added). But read *in* context, that sentence refers to the precedential effect on *parties*—*i.e.*,

---

opinion in *Izumi Seimitsu Kogyo Kabushiki Kaisha v. U.S. Philips Corp.*, 510 U.S. 27, 41 (1993) (Stevens, J., dissenting), which considered the propriety of vacating trial court orders. *Ante* at 28–29. Fair enough. But *Bancorp*—the decision *Hassoun II* quotes at length—concerned whether to vacate a published Court of Appeals decision. *See* 513 U.S. at 20. And *Hassoun II* invoked *Bancorp* on a motion to vacate a *published stay opinion of our Court*, just like this case.

18

by operation of law of the case—rather than precedential effect in *future cases*. To interpret one imprecise phrase in *Hassoun II* as Judge Menashi does now would also read it to contradict the rest of the same paragraph, which referred to the stay opinion as "precedent" *three* times. *Id.* at 134–35. (Why else, for example, would we have proclaimed that "precedents are presumptively correct and valuable to the legal community as a whole," *id.* at 134, if we were talking about something that was not precedential?) Moreover, it would require sticking one's head in the sand about the conclusion in *Hassoun II*, which was *not* to vacate the stay opinion precedent. Worse, it would contravene the *Munsingwear* doctrine itself, which instructs courts to balance the public benefits of *precedents* against the individual burdens created by *preclusion*. *See Bancorp*, 513 U.S. at 26–27; *see also Munsingwear*, 340 U.S. at 39–40.[8] And finally, it would render *Hassoun II* itself non-precedential, as an opinion decided on a motion to vacate.

---

[8] Judge Menashi, citing *Hassoun II*, *Munsingwear*, and *Azar v. Garza*, 584 U.S. 726 (2018), further speculates that "either the opinion of a motions panel will not bind future panels as law of the circuit or a party affected by the precedential effect of such an opinion would be entitled to vacatur should the case become moot before the merits are decided." *Ante* at 31. That entirely hypothetical scenario is best left to a future panel that actually confronts it. Nevertheless, of *Hassoun II*, *Munsingwear*, and *Garza*, only *Garza* resulted in vacatur—there, because the case became moot due to "the unilateral action of the party who prevailed in the lower court." 584 U.S. at 729 (quotation marks omitted); *see also Hassoun II*, 976 F.3d at 135 n.9 (Menashi, J.) (distinguishing *Garza* from *Hassoun* on the ground that *Hassoun* "did not become moot through the voluntary, unilateral action of the prevailing party"). That only reinforces that vacatur is an equitable remedy dependent on the behavior of the parties, especially since "[j]udicial precedents are presumptively correct and valuable to the legal community as a whole . . . and should stand unless a court concludes that the public interest would be served by vacatur." *Bancorp*, 513 U.S. at 26 (quotation marks omitted).

19

*Cf. Srour v. New York City*, 117 F.4th 72, 86 (2d Cir. 2024) (relying on *Hassoun II*'s vacatur holding); *see also Chen v. Garland*, 43 F.4th 244, 250 (2d Cir. 2022) (Menashi, J.) (citing *Hassoun I*, 968 F.3d at 195).

In our view, it is difficult to predict with perfect clarity the future effects of the stay opinions as law of the case or as precedent. The relevant authorities on these issues can be tested if the stay opinions' holdings are invoked as law of the case before the merits panel or as horizontal precedent in another matter—hopefully with the benefit of adversarial briefing and argument on this issue that we lack on consideration of this *en banc* petition. And after that, with the further benefit of the merits panel's decisions, the full Court may consider whether these cases satisfy our criteria for *en banc* review.[9]

In the meantime, Judge Menashi suggests that if "the stay opinions in these cases created dispositive precedent, that would plainly make the cases worthy of *en banc* review." *Ante* at 26 (quotation marks and citation omitted). Again, we think these questions are far more complicated than that ultimatum lets on. If the stay opinions are indeed precedential, that is most likely so only in the interim between now and when the merits panel resolves the appeal, taking into account whatever law of the case deference it deems appropriate.[10] That is why *en banc* review at this stage is

---

[9] Thus, contrary to Judge Menashi's suggestion, nothing about these cases "prevent[s]" *en banc* review such that "the rule of interpanel accord [is] unwarranted." *Cf. ante* at 26 n.24 (parenthetically quoting *N.C. Utils. Comm'n v. FCC*, 552 F.2d 1036, 1045 (4th Cir. 1977)).

[10] True, not all stay panel decisions end up before a merits panel. A case may become moot in the interim. In those circumstances, *Hassoun II* instructs courts to balance the burdens of preclusive-but-unreviewed judgments against the public

---

improper—not because the stay opinions are categorically nonprecedential, but because it is simply unnecessary and premature to involve the entire Circuit before the merits panel hears the cases.

And yet, here we are. It is unfortunate that Judge Menashi has seized upon the short period between consideration of the stay motion and merits in these cases to publish his thoughts and force discussion of such complicated issues with little briefing and no argument. If any of our procedures could be described as a "shadow docket," *ante* at 20, it would be this anomalous one at his instigation.

Our response, including on the merits, is motivated not by any desire to further litigate the active and ongoing issues in these cases, but out of necessity in order to present an even-handed account in this unusual procedural context. Any further exploration of these questions is best left for the merits panel and any future case that requires it. For now, these cases are procedurally, substantively, and prudentially ill-suited for *en banc* review, and so we concur in the denial of rehearing *en banc*.

---

benefits that flow from published precedents. We see no reason that the same would not be true in these cases.

PARKER AND CARNEY, *Senior Circuit Judges*, in support of the denial of rehearing *en banc*:

As members of the three-judge panel that decided the case, we fully endorse the concurrence filed by our third panel member, Judge Nathan, in the Court's denial of the petition for rehearing *en banc*.[1]

---

[1] Senior judges have no vote on a petition for rehearing *en banc*. *See* 28 U.S.C. § 46(c); Fed. R. App. P. 40(c). However, this Court's protocols permit senior judges who were members of the original panel in a case subject to a petition for rehearing *en banc* to file a statement expressing their views where, as here, an active judge has filed an opinion respecting that petition.